# VOLKSWAGEN OF AMERICA, INC. ET AL. *v.* YOUNG, INDIV. AND AS ADM'X OF THE ESTATE OF JAMES C. YOUNG ET AL.

[Misc. No. 5, September Term, 1973.]

*Decided July 8, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Laidler B. Mackall*, with whom were *Richard O. Cunningham, John M. Edsall, Scott R. Schoenfeld* and *Steptoe & Johnson, Herbert Rubin, Michael Hoenig* and *Herzfeld & Rubin, Hal C. B. Clagett* and *Sasscer, Clagett, Channing & Bucher* on the brief, for petitioners.

*John C. Joyce* and *F. Robert Troll, Jr.,* with whom were *Donald L. Hoage* and *Duckett, Orem, Christie & Beckett* on the brief, for respondents.

ELDRIDGE, J., delivered the opinion of the Court.

This matter reaches us via the Uniform Certification of Questions of Law Act, Maryland Code (1974), § 12-601 *et seq.,* of the Courts and Judicial Proceedings Article.[1] The case is a wrongful death action, filed in the United States District Court for the District of Columbia by the mother and the widow of James C. Young who was killed in a 1971 automobile accident in Prince George's County, Maryland. After the filing of the complaint and before any further proceedings took place, the defendants moved to certify a question of law to this Court; the plaintiffs consented; and the court issued an "Order For Certification." The question certified by the Order of the United States District Court is:

> "Whether or not, under Maryland law, the definition of the 'intended use' of a motor vehicle includes the vehicle's involvement in a collision and thus in turn, whether a cause of action is stated against the manufacturer or importer of said vehicle in breach of warranty or negligence or absolute liability or misrepresentation by allegations that the design and manufacture of the vehicle unreasonably increased the risk of injury to

---

1. That Act provides in pertinent part:

"§ 12-601. Jurisdiction granted to Court of Appeals

"The Court of Appeals may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a United States District Court, or the highest appellate court or the intermediate appellate court of any other state when requested by the certifying court if there is involved in any proceeding before the certifying court a question of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the Court of Appeals of this state.

* * * "

With regard to our jurisdiction under the Act, *see* Smith v. Gray Concrete Pipe Co., 267 Md. 149, 154-155, 297 A. 2d 721 (1972).

occupants following a collision not caused by any defect of the vehicle."

*Compare Evans v. General Motors Corporation,* 359 F. 2d 822 (7th Cir. 1966), *cert. den.* 385 U. S. 836, 87 S. Ct. 83, 17 L.Ed.2d 70 (1966), *with Larsen v. General Motors Corporation,* 391 F. 2d 495 (8th Cir. 1968).

The statement of "Facts Relevant to Question Certified" contained in the Order of the United States District Court is as follows:

"This is an action brought by plaintiffs against an automobile manufacturer who manufactures Volkswagen automobiles in Germany (VWAG) and against an importer of Volkswagen automobiles (VWOA), in which plaintiffs allege the wrongful death of plaintiffs' decedent, survival of decedent's claim and loss of consortium of decedent's widow based on breach of warranty, negligence, absolute liability and misrepresentation.

"The action allegedly grows out of a Maryland automobile accident in which plaintiffs' decedent, operating a Volkswagen in a northerly direction, stopped at a stop light and thereafter the Volkswagen was struck in the rear by another vehicle negligently driven in the same direction.

"The complaint alleges that immediately upon collision the Volkswagen was propelled forward and the seat assembly failed, resulting in plaintiffs' decedent being thrown into the rear portion of the Volkswagen where he allegedly suffered injuries which resulted in his death. The complaint alleges that the injuries were caused by the design and manufacture of the seat assembly and the design and manufacture of the passenger compartment structures, surfaces and protrusions.

"Plaintiffs do not allege that any defect in the Volkswagen caused or contributed to the collision, but all causes of action alleged are based upon the

so-called 'crashworthy doctrine' — that the 'intended use' of a motor vehicle includes the vehicle's involvement in collisions and thus in turn, that there is a duty to design and manufacture the vehicle so as not to unreasonably increase the risk of injury to occupants following a collision not caused by a defect in the vehicle."

The Order of the United States District Court further specified that the phrasing of the certified question was not intended to restrict our consideration of the problems involved and the issues as we perceive them in light of the complaint in the case.

The complaint in the case was attached to the "Order For Certification," and it reveals certain additional detail concerning the factual allegations. The Volkswagen which James C. Young was operating at the time of the accident was a 1968 "Type I Beetle Sedan." It was purchased on March 30, 1968 by the deceased in the state of Alabama. It was alleged that "[d]uring the course of said purchase, plaintiffs' decedent relied on advertisements by the defendants that he had seen, heard, and read in the communications media stating or implying that said Volkswagen was sound and fit for its intended and foreseeable purposes to be used as a passenger automobile on the streets and highways of the United States of America." It was further alleged that 'the vehicle was "defectively designed, manufactured, and marketed with defects which rendered it structurally hazardous, not merchantable, and not fit for the purpose intended" because the seat assembly was "unreasonably vulnerable to separation from the floor upon collision" and "[t]he rear passenger compartment structures, surfaces and protrusions . . . allowed an unreasonable risk of injury upon collision . . . ." The nature of the claimed defective design of the car was more specifically set forth in the allegations concerning the injury:

" . . . [T]he vehicle of plaintiffs' decedent was struck in the rear portion thereof by a 1967 Ford

negligently driven in the same direction by one William Benjamin Benson. Immediately upon collision the car driven by plaintiffs' decedent was propelled forward and the seat assembly unit, seat frame, seat bracing pieces, seat adjustment mechanism, seat reinforcements and metal tracks to which the seat itself was fastened, hereinafter collectively referred to as the 'seat assembly,' failed to withstand the impact against the rear of the vehicle with the direct and proximate result that the driver's seat separated from the floor of the car causing it and James C. Young, deceased, to be thrown violently into the rear portion of said car where his head, body and torso impacted into and was impacted by various inadequate and defectively designed passenger compartment structures, surfaces and protrusions."

The plaintiffs went on to allege that James Young's death directly resulted from the asserted design defects. Finally, it was alleged that the defendants had "actual notice and knowledge" of the defective seat assembly and rear compartment defects because of surveys and reports given to them and studies made by various testing institutions; that, notwithstanding these reports, defendants gave no warning to Volkswagen owners and operators generally or to James Young in particular; and that the defects were "latent and hidden." Several studies from named testing organizations were listed in the complaint.

In light of the factual allegations of the instant complaint, and with the qualifications hereinafter set forth, we answer the "Question Certified" in the affirmative. The "intended use" or "intended purpose" of an automobile, in our view, is not merely to provide transportation. It is to provide *reasonably safe* transportation. The complaint in this case was sufficient, we believe, to set forth a cause of action in negligence under Maryland law.

This is the first case to reach this Court concerning the extent of an automobile manufacturer's liability for a design defect resulting in enhanced injuries in a motor vehicle

accident, where the defect did not cause the initial impact or movement of the injured person. Such cases are often called "second collision" cases or "automobile crashworthiness" cases. They differ from other products liability cases involving defective automobiles by the combination of two factors. First, the alleged defect is in the design of the automobile rather than a negligent deviation during the construction or assembly process from the manner in which the vehicle was supposed to be made. The latter is usually called a "construction defect." [2] Second, the defect is not the cause of the initial impact. Typically, the actions of the driver of the car in which the plaintiff is riding, or the actions of the driver of another vehicle, or the actions of some third person, cause an initial disruption or impact which in turn results in the plaintiff's colliding with the interior (or occasionally the exterior) of the car. The plaintiff's collision with the car is the so-called "second collision." The issue of whether the automobile manufacturer has a duty to take reasonable steps to design its vehicles so as to minimize the injuries caused by "second collisions" has engendered much controversy and comment throughout the nation.

The principal case holding that an automobile manufacturer has no duty to design its cars so as to minimize the injuries suffered in automobile accidents is *Evans v. General Motors Corporation*, 359 F. 2d 822 (7th Cir. 1966), *cert. denied* 385 U. S. 836, 87 S. Ct. 83, 17 L.Ed.2d 70 (1966). The plaintiff in *Evans* was killed when his 1961 Chevrolet station wagon was struck broadside by another car. He claimed that General Motors was negligent in designing the frame of his car, inasmuch as an "X" type frame rather than a box or perimeter type frame was used, contrary to the construction of some other cars. The claim

---

**2.** The author of one article has described the distinction as follows (*Automobile Design Liability: Larsen v. General Motors And Its Aftermath*, 118 Univ. of Penn. L. Rev. 299, n. 4 (1969)):

"Design defects are, by definition, common to all vehicles of a particular model. Construction defects are generally limited to an extremely small portion of a given model."

was that an "X" type frame without side rails would not adequately protect occupants during a side impact collision, and that the defendant manufacturer had created an unreasonable risk of serious injury. The trial court, applying Indiana law, dismissed the complaint for failure to state a claim on which relief could be granted, and the dismissal was affirmed by the United States Court of Appeals for the Seventh Circuit. The Court of Appeals held that the critical question was the nature of the manufacturer's duty. It went on to conclude that a manufacturer has a duty only to design a car reasonably fit for its intended purpose, and that

> "[t]he intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur. As defendant argues, the defendant also knows that its automobiles may be driven into bodies of water, but it is not suggested that defendant has a duty to equip them with pontoons." (359 F. 2d at 825.)

The Court of Appeals for the Seventh Circuit also stated as grounds for its decision that a "manufacturer is not under a duty to make his automobile accident-proof or fool-proof" (*id.* at 824) and that requiring "manufacturers to construct automobiles in which it would be safe to collide . . . [is] a legislative function . . . ." (*Ibid.*)

Some of the cases applying the *Evans* holding that an automobile manufacturer has no duty to design the vehicle so as not to increase unreasonably the risk of injury following a collision are *McClung v. Ford Motor Company,* 333 F. Supp. 17 (S.D. W. Va. 1971), *aff'd per curiam* 472 F. 2d 240 (4th Cir. 1973); *Shumard v. General Motors Corporation,* 270 F. Supp. 311 (S.D. Ohio 1967); *Willis v. Chrysler Corporation,* 264 F. Supp. 1010 (S.D. Tex. 1967); *General Motors Corporation v. Howard,* 244 So. 2d 726 (Miss. 1971); *Ford Motor Co. v. Simpson,* 233 So. 2d 797 (Miss. 1970); *Walton v. Chrysler Motor Corp.,* 229 So. 2d 568 (Miss. 1969); *Biavaschi v. Frost,* CCH Prod. Liab. Rep. § 6547 (N. J. Super.

Ct. 1970); *Enders v. Volkswagenwerk, A.G.,* CCH Prod. Liab. Rep. § 5930 (Wis. Cir. Ct. 1968). *See also Frericks v. General Motors Corp.,* 20 Md. App. 518, 317 A. 2d 494 (1974), *cert. granted* July 5, 1974 (No. 88, September Term, 1974).

The seminal case on the other side of the issue is *Larsen v. General Motors Corporation,* 391 F. 2d 495 (8th Cir. 1968). The plaintiff in *Larsen* suffered severe bodily injuries while driving a 1963 Corvair which collided head-on with another car. The impact caused the steering mechanism to thrust forward into the plaintiff's head. The suit against General Motors charged negligence in the design of the steering assembly and the placement of the component parts of the steering assembly into the structure of the car. It was alleged that General Motors was also negligent in not warning the user of this latent condition. The specific defect relied upon by the plaintiff was that the solid steering shaft was so designed as to extend "without interruption from a point 2.7 inches in front of the leading surface of the front tires to a position directly in front of the driver," exposing him "to an unreasonable risk of injury from the rearward displacement of that shaft in the event of a left-of-center head-on collision. So positioned it receives the initial impact of forces generated by a left-of-center head-on collision. The unabsorbed forces of the collision in this area are transmitted directly toward the driver's head, the shaft acting as a spear aimed at a vital part of the driver's anatomy." 391 F. 2d 497, n. 2. The plaintiff also pointed out that other cars were designed so as to protect against such rearward displacement, in that the steering column did not protrude beyond the forward surface of the front tires. The lower court in *Larsen* granted General Motors' motion for summary judgment on the theory that the manufacturer had no duty to design a vehicle which would protect the plaintiff from injury in a collision. On appeal, the United States Court of Appeals for the Eighth Circuit reversed, holding that the plaintiff had made out a sufficient case for consideration by the jury.

The Court of Appeals in *Larsen* first reviewed the many cases throughout the country holding manufacturers liable

in tort for hidden defects in automobiles, whether of design or construction, which made the vehicles unsuitable for their intended use, causing collisions and resulting injuries. 391 F. 2d at 501. The court then stated that the issue was whether an injury resulting from the so-called "second collision" was encompassed within the "intended use" of an automobile (*id.* at 501-502):

> "Accepting, therefore, the principle that a manufacturer's duty of design and construction extends to producing a product that is reasonably fit for its intended use and free of hidden defects that could render it unsafe for such use, the issue narrows on the proper interpretation of 'intended use.' Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points. This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-producing impacts of various types. The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident."

And later the court emphasized (*id.* at 502):

> "The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art."

The Court of Appeals concluded that an automobile manufacturer "is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." (*Ibid.*)

The *Larsen* court then emphasized the limitations of its

holding; that it was not making automobile manufacturers "insurers"; that it was merely applying common law principles of negligence; that the standard for manufacturers was "reasonable care"; and that an automobile did not have to be absolutely crash-proof but only designed to provide "a reasonably safe vehicle in which to travel." 391 F. 2d at 503. The court went on to reiterate these limitations, stating (*ibid.*):

> "This duty of reasonable care in design rests on common law negligence that a manufacturer of an article should use reasonable care in the design and manufacture of his product to eliminate any unreasonable risk of foreseeable injury. The duty of reasonable care in design should be viewed in light of the risk. While all risks cannot be eliminated nor can a crash-proof vehicle be designed under the present state of the art, there are many common-sense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision. The standard of reasonable care is applied in many other negligence situations and should be applied here."

The court also stated that the "failure to use reasonable care in design or knowledge of a defective design gives rise to the reasonable duty on the manufacturer to warn of this condition." (*Id.* at 505.) The court continued (*ibid.*):

> "Where the danger is obvious and known to the user, no warning is necessary and no liability attaches for an injury occurring from the reasonable hazards attached to the use of chattels or commodities; but where the dangerous condition is latent it should be disclosed to the user, and non-disclosure should subject the maker or supplier to liability for creating an unreasonable risk."

A growing number of jurisdictions have followed the principles set forth in *Larsen* in so-called "second collision"

cases. Just last year the Court of Appeals of New York adopted the *Larsen* view with respect to an alleged design defect in a motorcycle, which enhanced the motorcycle operator's injuries following an initial collision with an automobile. The New York court in *Bolm v. Triumph Corporation,* 33 N.Y.2d 151, 305 N.E.2d 769, 772 (1973), held that the trier of facts should determine if there was a latent design defect which the manufacturer could have reasonably foreseen would cause injury, saying:

> "As was stated in *Campo* [*v. Scofield,* 301 N.Y. 468, 95 N.E.2d 802 (1950)], a manufacturer is under no duty to design a product which is accident-proof. There is no liability on the part of a manufacturer for injuries resulting from dangers which are patent or obvious. Thus, the operator of a motor vehicle assumes the dangers which inhere in its operation, including the probability of many 'second collision' injuries. The extent of that assumption, however, should be no greater than those 'second collision' injuries which would result from an impact in a reasonably designed and constructed vehicle. While a vehicle need not be made 'crash-worthy,' the manufacturer should not be permitted to argue that a user of its product assumes dangers from unknown or latent defects, either in construction or design, which the manufacturer can reasonably foresee will cause injury on impact. The standards for imposing liability for such unreasonably dangerous design defects are, thus, general negligence principles (see Larsen v. General Motors Corp., *supra* . . . ."

Even more recently, the United States Court of Appeals for the Fourth Circuit, applying Virginia law and assuming that Virginia would follow *Larsen,* applied the principles of *Larsen* to reverse a verdict in favor of the plaintiff and to hold that the manufacturer was not liable under the facts of that case. In *Dreisonstok v. Volkswagenwerk, A.G.,* 489 F. 2d 1066 (4th Cir. 1974), the plaintiff was seated in the center

of the seat of a Volkswagen "microbus" next to the driver. Upon impact with a telephone pole the vehicle crumpled, causing the plaintiff's leg to fasten between the seat and the dashboard of the van and throwing her forward. The plaintiff claimed, *inter alia,* that the vehicle was defectively designed because the manufacturer failed to provide " 'sufficient energy-absorbing materials or devices or "crush space" . . . so that at 40 miles an hour the integrity of the passenger compartment would not be violated. . . .' " (*Id.* at 1068-1069.) The crux of the plaintiff's case was that the " 'Volkswagen station wagon did not provide the protection for the front seat passengers as did the "normal" or standard passenger car,' " with the passengers in the middle, the motor in the front, and a "long hood" in front of the passenger compartment (*id.* at 1074).

The United States Court of Appeals for the Fourth Circuit in *Dreisonstok,* quoting extensively from *Larsen,* emphasized that the manufacturer's duty is to design a vehicle so that there is no " '*unreasonable risk* of injury in the event of a collision' " and that liability " 'is imposed only when an unreasonable danger is created.' " (489 F. 2d at 1071.) The court went on to hold that in determining whether the design of a vehicle gives rise to an unreasonable risk of danger in a second collision, the court must consider the "attractiveness of the style of the car" as an element "by which buyers are influenced"; the "purpose of the particular type of vehicle"; the price of the vehicle; and the circumstances of the accident, for example whether it is a "head-on" collision, whether the vehicle is traveling at a high speed, etc. (*Id.* at 1072-1073.) The court then stated (*id.* at 1073):

> "In summary, every case such as this involves a delicate balancing of many factors in order to determine whether the manufacturer has used ordinary care in designing a car, which, giving consideration to the market purposes and utility of the vehicle, did not involve unreasonable risk of injury to occupants within the range of its 'intended use.' "

The court applied these principles to hold that the manufacturer's design had not been negligent, as the vehicle was of a "special type and particular design . . . uniquely developed in order to provide the owner with the maximum amount of either cargo or passenger space in a vehicle inexpensively priced and of such dimensions as to make possible easy maneuverability." (*Id.* at 1073-1074.) In addition to holding that the design was not unreasonable in light of the pertinent factors that must be considered, the court also relied on the fact that the nature of the design and any danger inherent in not having any substantial part of the vehicle in front of the passenger compartment "was readily discernible to any one using the vehicle; in fact, it was . . . the unique feature of the vehicle." (*Id.* at 1074.)

Other cases adopting and applying the *Larsen* principles to design defects in automobiles causing "second collisions" are: *Passwaters v. General Motors Corporation*, 454 F. 2d 1270 (8th Cir. 1972); *Bremier v. Volkswagen of America, Inc.*, 340 F. Supp. 949 (D.D.C. 1972); *Grundmanis v. British Motor Corporation*, 308 F. Supp. 303 (E.D. Wis. 1970); *Dyson v. General Motors Corporation*, 298 F. Supp. 1064 (E.D. Pa. 1969); *Badorek v. General Motors Corporation*, 11 Cal. App. 3d 902, 90 Cal. Rptr. 305 (1970); *Culpepper v. Volkswagen of America, Inc.*, 33 Cal. App. 3d 510, 109 Cal. Rptr. 110 (1973); *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P. 2d 268 (Mont. 1973); *May v. Portland Jeep, Inc.*, 509 P. 2d 24 (Or. 1973); *Mickle v. Blackmon*, 252 S. C. 202, 166 S.E.2d 173 (1969).[3]

In our view, *Larsen v. General Motors Corporation, supra,*

---

3. The question of a motor vehicle manufacturer's liability for a design defect which enhances injuries in a "second collision" has also been the subject of much legal literature. *See, e.g.,* Sklaw, *"Second Collision" Liability: The Need For Uniformity,* 4 Seton Hall L. Rev. 499 (1973); Hoenig and Werber, *Automobile "Crashworthiness": An Untenable Doctrine,* 20 Clev. St. L. Rev. 578 (1971); Note, 24 Vanderbilt L. Rev. 862 (1971); *Automobile Design Liability: Larsen v. General Motors And Its Aftermath,* 118 U. Penn. L. Rev. 299 (1969); Note, *"Intended Use" And The Unsafe Automobile: Manufacturers' Liability For Negligent Design,* 28 Md. L. Rev. 386 (1968); Nader and Page, *Automobile Design and the Judicial Process,* 55 Cal. L. Rev. 645 (1967); Note, *Liability for Negligent Automobile Design,* 52 Iowa L. Rev. 953 (1967); Katz, *Liability Of Automobile Manufacturers For Unsafe Design of Passenger Cars,* 69 Harv. L. Rev. 863 (1956).

and the cases following it, are more in accord with traditional negligence principles than *Evans v. General Motors Corporation, supra.* Since the time of *MacPherson v. Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050 (1916), it has been generally held that an automobile manufacturer or supplier, like the manufacturer or supplier of other products, is liable in negligence to an ultimate user of the vehicle for a construction defect of which he was or reasonably should have been aware, which was not obvious to the user, and which causes a collision and resulting injuries. *See Woolley v. Uebelhor,* 239 Md. 318, 325, 211 A. 2d 302 (1965).

The principle is no different where the defect is in the design of a product rather than its construction. We have imposed liability upon manufacturers for injuries caused by the unsafe *designs* of their products, *Babylon v. Scruton,* 215 Md. 299, 138 A. 2d 375 (1958). *See also Restatement 2d, Torts,* § 398. The recent cases in Maryland which have held manufacturers and suppliers not liable for allegedly unsafe designs of their products, have not been on the theory that a design defect does not give rise to a cause of action in negligence; instead, the denial of liability in each case was based on the fact that the danger in the design was patent or obvious to the user. *Patten v. Logemann Bros. Co.,* 263 Md. 364, 283 A. 2d 567 (1971); *Blankenship v. Morrison Mach. Co.,* 255 Md. 241, 257 A. 2d 430 (1969); *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A. 2d 855 (1969). Where the unsafe design was not obvious to the user, the manufacturer was held responsible, *Babylon v. Scruton, supra.*

That the design defect does not cause the initial collision should make no difference if it is a cause of the ultimate injury. Where the injuries to an occupant of a motor vehicle resulted from both the negligence of a driver as well as a negligent condition created by some other entity, this Court has held that both negligent actors may be liable, *Howard County v. Leaf,* 177 Md. 82, 95, 8 A. 2d 756 (1939). We have also stated that the "aggravation of the results of a collision" may give rise to tort liability, *Warner v. Markoe,* 171 Md. 351, 358, 189 A. 260 (1937). As stated by the Court of Appeals

of New York in *Bolm v. Triumph Corporation, supra,* 305 N. E. at 773-774:

> "Neither sound policy nor reason can be found to justify a distinction between the liability of the manufacturer whose defective item causes the initial accident and that of the manufacturer whose defective product aggravates or enhances the injuries after an intervening impact. Assuming that in each case the defect is 'a substantial factor in bringing about [the] injury or damages,' what possible justification is there for disallowing a claim against the manufacturer whose defective product results in injury after a foreseeable intervening cause? It is well settled that foreseeable intervening cause will not relieve a wrongdoer of liability in other situations (41 N.Y.Jur., Negligence, § 38; 2 Harper and James, Law of Torts, § 20-5). We can perceive no reason why a manufacturer of motor vehicles should be held to a lesser degree of liability. Accordingly, we reject the 'second collision rule' in favor of traditional rules of negligence and warranty:"

In sum, "traditional rules of negligence" lead to the conclusion that an automobile manufacturer is liable for a defect in design which the manufacturer could have reasonably foreseen would cause or enhance injuries on impact, which is not patent or obvious to the user, and which in fact leads to or enhances the injuries in an automobile collision.

The arguments advanced by Volkswagen in the instant case for creating an exception to the application of traditional negligence principles in "second collision" cases are not persuasive. They are essentially the same reasons set forth by the United States Court of Appeals for the Seventh Circuit in *Evans* and the other cases following *Evans.* Volkswagen's principal arguments are: (1) that the intended purpose of an automobile is transportation and does not include its participation in collisions; (2) that "a

manufacturer is not required to produce accident-proof or injury-proof cars"; (3) that manufacturers are not insurers; and (4) that "[d]esign requirements are a legislative, not a judicial function . . . ."

While the intended purpose of an automobile may not be to participate in collisions, the intended purpose includes providing a reasonable measure of safety when, inevitably, collisions do occur. For many years automobiles have been equipped with safety glass, bumpers, windshield wipers, etc. More recently, and largely as a result of governmental action, automobiles are equipped with additional safety devices such as seat belts, shoulder harnesses, padded dashboards, padded visors, non-protruding knobs, etc. Frequent collisions are foreseeable, and the intended purpose of all of these parts of the vehicle is to afford reasonable safety when those collisions occur.

The arguments that there is no duty to design "accident-proof" or "injury-proof" vehicles, and that automobile manufacturers are not insurers, are "straw men." No case has ever held that an automobile manufacturer must design an "accident-proof" or "injury-proof" vehicle or that the manufacturer is an insurer. Concerning two of the examples most often used by the advocates of non-liability for design defects, no one has suggested that an automobile must be designed to withstand a high speed head-on collision with a truck or to float if it leaves the road and goes into a body of water. As the court stated in *Larsen, supra,* 391 F. 2d at 502:

> "We do agree that under the present state of the art an automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision."

The standard to be applied is the traditional one of reasonableness.

The contention that the design of automobiles involves a legislative function and not a judicial function, similarly furnishes no sound reason for exempting automobile "second collision" cases from the normal principles of tort liability. Legislative or administrative requirements that persons or businesses conduct their operations in a particular manner, and adhere to specified standards, have never been viewed as supplanting tort liability. On the contrary, such statutory or regulatory requirements are deemed to furnish standards by which courts or juries determine, along with other circumstances, whether or not conduct is negligent. Failure to adhere to those standards is evidence of negligence for the court or jury to consider. *McLhinney v. Lansdell Corp. of Md.*, 254 Md. 7, 14-15, 254 A. 2d 177 (1969); *Paramount Development v. Hunter*, 249 Md. 188, 193, 238 A. 2d 869 (1968); *Aravanis v. Eisenberg*, 237 Md. 242, 259, 260, 206 A. 2d 148 (1965); *Liberto v. Holfeldt*, 221 Md. 62, 65, 155 A. 2d 698 (1959); *Austin v. Buettner*, 211 Md. 61, 70, 124 A. 2d 793 (1956), and cases therein cited. Moreover, the most significant legislation dealing with motor vehicle safety standards makes it clear that Congress did not view the question of safe motor vehicle design as solely a legislative problem. The National Traffic and Motor Vehicle Safety Act of 1966 specifically provides that "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." 15 U.S.C. 1397 (c). The committee reports and debates specify that the purpose of this provision was to insure that "state common law standards of care" and the principles of "product liability at common law" would continue to be viable, and that the legislative safety standards were not "to affect the rights of parties under common law . . . ." S. Rep. No. 1301, Committee on Commerce, 89 Cong., 2d Sess. 1966, p. 12; H.R. Rep. No. 1776, Committee on Interstate and Foreign Commerce, 89 Cong., 2d Sess. 1966, p. 24; 112 Cong. Rec. 14230 (1966).

While we hold that the federal court complaint in the present case is sufficient to set forth a cause of action in negligence under Maryland law, the limitations upon this

type of liability should be reiterated. As emphasized in *Larsen* and the cases following it, the automobile manufacturer does not have to design a crash-proof car. Instead, the manufacturer must use only reasonable care in the design of a vehicle in order to avoid subjecting a user to an unreasonable risk of injury in a collision.

Moreover, in determining "reasonableness," many factors must be considered. There must be "a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm." *Larsen, supra,* 391 F. 2d at 502, n. 3. The style and type of vehicle, and its particular purpose, must be taken into consideration. A "convertible could not be made 'as safe in roll-over accidents as a standard four-door sedan with center posts and full-door frames.' " *Dreisonstok v. Volkswagenwerk, A.G., supra,* 489 F. 2d at 1072, quoting from *Dyson v. General Motors Corporation, supra,* 298 F. Supp. at 1073. Price must be a pertinent factor, as the cost of a particular design change may in some instances be so great, while adding little to safety, that the vehicle will be taken "out of the price range of the market to which it was intended to appeal." *Dreisonstok, supra,* 489 F. 2d at 1073. And the price of the vehicle itself should be considered, for "a Cadillac may be expected to include more in the way of . . . 'crashworthiness' than the economy car." *Id.* at 1073. The nature of the accident is to be taken into account, as " 'it could not reasonably be argued that a car manufacturer should be held liable because its vehicle collapsed when involved in a head-on collision with a large truck, at high speed.' " *Id.* at 1073; *Dyson, supra,* 298 F. Supp. at 1073. There are perhaps many other factors that will be pertinent in particular cases. In order to impose liability, the trier of the facts must be able to conclude that the design was unreasonable in light of all of the relevant considerations.

In addition, there can be no recovery if the danger inherent in the particular design was obvious or patent to the user of the vehicle. *Larsen, supra,* 391 F. 2d at 505. *See*

*also Patten v. Logemann Bros. Co., supra,* 263 Md. at 368-370; *Blankenship v. Morrison Mach. Co., supra,* 255 Md. at 245-246; *Myers v. Montgomery Ward & Co., supra,* 253 Md. at 292-295.

The plaintiffs-respondents also argued before us that their complaint was sufficient to state a cause of action under theories of breach of warranty and strict liability. As to a cause of action for breach of warranty, this would depend upon Alabama law and not Maryland law. The general rule, to which we adhere, is that "the law of the place of the sale determines the extent and effect of the warranties which attend the sale." *Schultz v. Tecumseh Products,* 310 F. 2d 426, 428 (6th Cir. 1962). *See also, e.g., Modern Farm Service, Inc. v. Ben Pearson, Inc.,* 308 F. 2d 18, 22-23 (5th Cir. 1962); *Texas Motorcoaches v. A.C.F. Motors Co.,* 154 F. 2d 91, 93 (3rd Cir. 1946); *Pipe Welding Supply Co. v. Gas Atmospheres, Inc.,* 201 F. Supp. 191, 196-197 (N.D. Ohio 1961); *Grummons v. Zollinger,* 189 F. Supp. 64, 66 (N.D. Ind. 1960); *Hunt Truck Sales and Service, Inc. v. Omaha Standard,* 187 F. Supp. 796, 798-799 (S.D. Iowa 1960); *Hermanson v. Hermanson,* 19 Conn. Sup. 479, 117 A. 2d 840, 842 (1954); *McCrossin v. Hicks Chevrolet, Inc.,* 248 A. 2d 917, 921 (D.C. 1969); *Amos v. Walter N. Kelley Co.,* 240 Mich. 257, 215 N. W. 397 (1927); *Somerville Container Sales v. General Metal Corp.,* 39 N. J. Super. 348, 120 A. 2d 866, 871 (1956); *but cf. Uppgren v. Executive Aviation Services, Inc.,* 326 F. Supp. 709 (D. Md. 1971). Since the Volkswagen was purchased in Alabama, the law of that state determines whether a cause of action for breach of warranty was alleged.

With respect to the contention that the complaint sets forth a cause of action under the "strict liability" theory of *Restatement 2d, Torts,* § 402A, this Court has not endorsed the theory of that section. *Bona v. Graefe,* 264 Md. 69, 77, 285 A. 2d 607 (1972); *Myers v. Montgomery Ward & Co., supra,* 253 Md. at 296-297; *Telak v. Maszczenski,* 248 Md. 476, 487-489, 237 A. 2d 434 (1968). Regardless of whether the theory of § 402A of the *Restatement* should be accepted in other contexts, we are convinced that it has no proper

application to liability for *design* defects in motor vehicles. The thrust of § 402A is that a seller of "any product in a defective condition" is liable to a user for harm caused by that defective condition even though "the seller has exercised all possible care in the preparation and sale of his product." This principle obviously changes the standard of care with regard to a *construction defect*. But as to a defect in *design*, it has no special meaning. Since the existence of a defective design depends upon the reasonableness of the manufacturer's action, and depends upon the degree of care which he has exercised, it is wholly illogical to speak of a defective *design* even though the manufacturer has "exercised all possible care" in the preparation of his product. While a few cases applying *Larsen* principles have used language of "strict liability" with respect to design defects, it has been recognized that this results in "no practical difference" from the application of negligence principles. Note, 24 Vanderbilt L. Rev. 862, 866-867 (1971); Sklaw, *"Second Collision" Liability: The Need For Uniformity*, 4 Seton Hall L. Rev. 499, 507, 522-523 (1973). Consequently, the tort liability under Maryland law of a manufacturer or supplier of a motor vehicle, for a defective design which enhances injuries in a collision, depends upon traditional principles of negligence.

> *Question of law answered as herein set forth.*
> *Petitioners to pay costs.*