**EXCHANGE BANK & TRUST COMPANY, Petitioner,**

v.

**PURE ICE & COLD STORAGE COMPANY, Respondent.**

**No. B–5.**

Supreme Court of Texas.

May 31, 1967.

Rehearing Denied July 5, 1967.

Bailey, Williams, Weber & Allums, Lawrence R. Maxwell, Jr., Dallas, for petitioner.

Biggers, Baker, Lloyd & Carver, John C. Biggers, Dallas, for respondent.

POPE, Justice.

The question presented is whether Pure Ice & Cold Storage Company, the plaintiff and payee of a check drawn on defendant Exchange Bank & Trust Company, exercised an election to hold Exchange Bank liable for its admitted delay in returning a dishonored check within the time provided

in art. 342–704 Vernon's Ann.Civ.St. The trial court sustained Exchange Bank's motion for judgment notwithstanding the verdict because Pure Ice, as a matter of law, failed to exercise the election. The court of civil appeals reversed the judgment and rendered judgment for Pure Ice. 408 S.W. 2d 319. In our opinion the judgment of the trial court was the correct one.

The case is controlled by that part of the Bank Collection Code contained in art. 342–704 which section has since been repealed and changed by the enactment of the Uniform Commercial Code,[1] Acts 1965, 59th Leg., Vol. 2, p. 1, ch. 721. The former statute required a drawee bank to return a dishonored check by midnight of the banking day after presentment at the risk of being liable for the delay. The bank's liability under the statute was not automatic, but depended upon the check owner's exercise of an election to hold the drawee bank. Morrison and Sneed, Bank Collections, 32 Tex.L.Rev. 259, 293 (1954). The article provided:

> "Except where otherwise provided in this Code, or by express agreement of the parties, items presented to a drawee bank shall be received by it, subject to final adjustment and all clearing house settlements, checks, drafts, credits, advances of money, charges or entries to accounts, (including sight posting), shall be conditional and subject to revocation during the day on which the item is presented (or in case of a time item, the due date), or until midnight of the banking day after the day of presentment, exclusive of Sundays and holidays, if it

is finally determined that the drawee bank was not at the time of presentment (or in case of a time item, the due date) authorized or obligated to pay the item, and if the drawee bank shall within that time refuse payment and return the item, or undertake to give notice in the manner hereinafter prescribed:

> \* \* \* \* \* \*

> "2. If the item is presented through a clearing house, the drawee bank shall, within the time prescribed, return the item to the clearing house presenting it.

> "3. \* \* If the drawee bank in refusing payment of any item fails to comply with the provisions of this Article within the time above prescribed it shall, at the election of the owner of the item, be deemed to have accepted the item, and shall be liable for the amount thereof. If an item is presented by a bank as agent or sub-agent of owner, such bank may, in the absence of definite instructions from the owner, exercise the election herein provided for. Acts 1943, 48th Leg., p. 154, ch. 97, subch. VII, art. 4; Acts 1957, 55th Leg., p. 1295, ch. 434, § 1."

The trial court submitted issues to the jury inquiring whether Pure Ice waived its right to hold Exchange Bank. The jury found that Pure Ice did not waive its right. The trial court, however, rendered judgment notwithstanding the jury findings on waiver because all of the evidence showed that Pure Ice did not exercise its statutory election to hold Exchange Bank. The rights of the owner of an item against the

---

1. Uniform Commercial Code: § 4–302. "In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of Section 4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
   (a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or
   (b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."

drawee are expressed in the statute in terms of an election rather than waiver, but the parties have used the terms and tried the case without distinguishing them. In any event, it is our opinion that the trial court correctly rendered judgment for Exchange Bank because the stipulations and undisputed evidence show that Pure Ice did not elect to hold and did voluntarily relinquish its known rights against Exchange Bank.

On Friday, September 21, 1962, James O. Calvin gave Pure Ice his check for $4,500.00 drawn on defendant, Exchange Bank. On Monday, September 24, Pure Ice deposited the check to its account with Mercantile National Bank at Dallas. The parties stipulated that Mercantile was the agent for Pure Ice in the events which followed the deposit. Article 342–702, V.C.S. They also agreed that Mercantile on the day of the deposit, sent the check through the Dallas clearing house to the drawee, Exchange Bank. Exchange Bank received the check on Tuesday, September 25 and dishonored it because Calvin had insufficient funds in his account. Exchange Bank did not return the check until September 27, two days later, which was beyond the statutory deadline. Mercantile knew that Exchange Bank returned the check after midnight of the banking day after the day of presentment. Mr. Kadane, president of Pure Ice, testified that both he and Mercantile knew of the two-day lapse of time. One of Mercantile's officers testified that three courses of action were then available to it as agent for its depositor. It could have advised Exchange Bank that the owner of the check elected to hold Exchange Bank liable for its late return. It could have accepted the late return of the check after requiring Exchange Bank to furnish a letter guaranteeing payment of the item. It could have charged back the amount of the check which had been credited to Pure Ice. Mercantile, in fact followed the last procedure.

When the dishonored check was first returned to Mercantile, the person handling the account called and reported that fact to Mr. Kadane, the president of Pure Ice. Mr. Kadane in turn called Calvin, the drawer, who assured Kadane that he had sufficient funds on deposit at Exchange Bank. Mercantile, upon Kadane's instructions, sent the check back through the clearing house to Exchange Bank and it was dishonored a second time. On Monday, October 1, Mercantile reported to Kadane that the check was again dishonored. Kadane instructed Mercantile to send the check back to Exchange Bank a third time, and the check was again dishonored. Mercantile discussed with Kadane the matter of the dishonored check by telephone conversations on September 27, October 1, 3 and 4. On October 5, Mercantile revoked the provisional credit it had given its depositor, Pure Ice. On October 6, Kadane obtained a promissory note from Calvin to evidence the amount of his unpaid check as well as several others not here involved. Kadane testified that he knew Mercantile had charged back the $4,500.00 which was provisionally credited to his account when he made the original deposit on September 24 and that his purpose in obtaining the promissory note from Calvin was to have "an acknowledgment of his indebtedness to me." He said that he was looking to Calvin during the time that the check was dishonored.

From September 25, 1962 to September 18, 1964, nobody contacted or notified Exchange Bank that Pure Ice elected to hold Exchange Bank because of its late return of the dishonored check. The institution of this action was the fact which Pure Ice contends was an exercise of its election under art. 342–704 to hold Exchange Bank. That fact is the basis for the intermediate court's opinion that Pure Ice elected to hold Exchange Bank. Mr. Kadane testified that he had entertained an intent to hold Exchange Bank liable, but there is no evidence that such an intent was ever communicated to Exchange Bank or anyone else prior to the time Pure Ice filed this action.

The meaning of the term "election" used in the statute has not been construed so

far as the parties or this court have been able to discover. In general, an election means the obligation to choose between two inconsistent or alternative rights. Black's Law Dictionary 632 (4th ed. 1951). A portion of art. 342–704 was construed in Carder v. Tyler Bank & Trust Company, D.C., 132 F.Supp. 495, 503, affirmed 5 Cir., 224 F.2d 687, cert. den., 350 U.S. 913, 76 S.Ct. 197, 100 L.Ed. 801 (1955). The case concerned the effect of a bank's customary practice of holding drafts beyond the statutory deadline. The case incidentally states that sometime before suit was filed, the payee made demand upon the drawee bank. Suit was actually tried ten months after the late return of the drafts. Election was not the issue in that case and it is not helpful.

■ The very nature of the banking transaction required Pure Ice to exercise its election to hold Exchange Bank with reasonable promptness. When a payee deposits a check to his account, he receives a provisional credit. The check may then pass through several correspondent banks and a clearing house before it reaches the payor bank and as it does, each bank which handles the transaction records a provisional credit for the item. Upon payment by the payor bank, all the provisional credits become final settlements. If, however, the check is dishonored, all the provisional credits are revoked and charged back as the check returns along the route from whence it came until it is returned to the original depositor, who then holds the dishonored check. See Uniform Commercial Code, art. 4–213, V.C.S. The practical necessity for settling the provisional credits is the reason for the statute's requirement that the payor bank promptly return any dishonored check.[2] Otherwise the provisional credits remain unsettled. Applied to the facts of this case, all of the provisional credits were reversed and charged back as the check traveled back to the hands of Pure Ice, the original depositor-payee. After almost two years, Pure Ice took the position that the provisional credits should not have been reversed but should have stood, because Exchange Bank, by holding the check, in law, was deemed to have honored the check. Such a construction would mean that provisional credits or their revocation would remain unsettled up to the time limitations barred an action against the payor bank. The payor bank's remedy against the drawer of the check would in many instances be affected or lost by the drawer's death, insolvency, or his closing the account. Many recorded balances would be so uncertain as to be meaningless for long periods of time.

2. "Subsection (4) states when certain credits given by a bank to its customer become available for withdrawal as of right. Subsection (4) (a) deals with the situation where a bank has given a credit (usually provisional) for an item to its customer and in turn has received a provisional settlement for the item from an intermediary or payor bank to which it has forwarded the item. In this situation before the provisional credit entered by the collecting bank in the account of its customer becomes available for withdrawal as of right, it is not only necessary that the provisional settlement received by the bank for the item becomes final but also that the collecting bank has a reasonable time to learn that this is so. Hence, subsection (4) (a) imposes both of these conditions. If the provisional settlement received is a provisional debit or credit in an account with the intermediary or payor bank or a remittance instrument on some bank other than the collecting bank itself, the collecting bank will usually learn that this debit or credit is final or that the remittance instrument has been paid merely by not learning the opposite within a reasonable time. How much time is "reasonable" for these purposes will of course depend on the distance the item has to travel and the number of banks through which it must pass (having in mind not only travel time by regular lines of transmission but also the successive midnight deadlines of the several banks) and other pertinent facts. * * *" Comment on art. 4–213, Uniform Commercial Code, Uniform Commercial Code Reporting Service, § 4213.

■ In this context, the election authorized by the Bank Collection Code required the payee to elect and to make known its election to the payor bank with reasonable promptness, which the evidence shows did not happen in this case. Pure Ice for almost two years neither said nor did anything consistent with its contention that it elected to hold Exchange Bank. The trial court properly granted judgment for Exchange Bank notwithstanding the verdict.

The judgment of the court of civil appeals is reversed and that of the trial court is affirmed.